[The official term of AARON ROBERTSON expired February 5th, 1848, and ROBERT H. McCARTER was appointed a judge of this court for six years from that day.]

## JOSPH E. EDSALL AND ELIAS L'HOMMEDIEU, APPELLANTS, AND THE HAMBURGH MANUFACTURING COMPANY AND OTHERS, RESPONDENTS.

Several executions had been levied by a sheriff on the lands of " The Hamburgh Manufacturing Company," of which the first in priority was in favor of E. The same sheriff had in his hands at the same time an execution issued on a decree in chancery, on the first mortgage, for the sale of the mine farm of " The Clinton Manufacturing Company," and also an execution at law against the said Clinton company, by virtue of which he had levied on the said Clinton company's mine farm. E. held a subsequent mortgage on this Clinton mine farm. Prior to the sale by the sheriff, certain creditors of the Hamburgh company, having no judgments, together with E., entered into an agreement in writing among themselves, that L., one of them, should, as their trustee, buy the lands of both companies, as a means of securing their debts against the Hamburgh company, including E.'s judgment and other claims he had or made against the Hamburgh company, and his mortgage on the Clinton mine farm. There was also an understanding with P., who held the bulk of the stock of both companies, and was carrying on or conducting the business of the Hamburgh company, that the said trustee should convey both properties to him, on his paying the debts of the said agreeing Hamburgh creditors and the sums for which

the properties should be struck off to the said trustee. The properties were sold by the sheriff and bought by the said L.; the other judgment creditors of the Hamburgh company not being present at the sale. The sheriff's deed to L. was absolute. On a bill filed by the Hamburgh company and P., it was held that L. was a trustee for the Hamburgh company and its creditors, both of the Hamburgh property and of the Clinton mine farm.

This case is reported *ante p.* 249.

*S. G. Potts* and *P. D. Vroom,* for the appellants.

*E. N. Dickerson, B. Williamson* and *W. Pennington,* for the respondents.

JOSEPH F. RANDOLPH, Justice, delivered the following opinion:

The Hamburgh Manufacturing Company was incorporated in March, eighteen hundred and thirty-six, and shortly after was organized, became seized of considerable real estate, and went into operation in the manufacture of iron; and in the January following, Edward W. Pratt became the owner, by purchase, exchange or forfeiture, of nearly all of the stock of the company, and also nineteen hundred and eighty out of twenty-five hundred shares in the Clinton Manufacturing Company, another incorporation for the manufacture of iron, located at no great distance from the works of the Hamburgh company; the Clinton company being the owners, amongst other real estate, of a tract of land of about one hundred and fifty acres, on which was a valuable bed of hematite ore, about forty acres and a half of which tract the company sold to the Hamburgh company. The two companies jointly opened a mine on that part of the tract remaining the property of the Clinton company, and used the ore for the operations of both companies.

In less than two years, both companies became largely involved in debt, and their property advertised for sale by the sheriff of Sussex county, by virtue of sundry executions issued out of the county and state courts. After repeated adjournments, to enable Pratt or the companies to raise the money and pay off the executions, the sheriff at length sold the property of the two companies, first the personal and afterwards the real estate. On

the seventh day of December, eighteen hundred and thirty-
eight, the mine tract of the Clinton company, except the forty
and a half acres sold to the Hamburgh company, were struck
off to the defendant, Elias L'Hommedieu, for the sum of four
thousand and forty-one dollars, he being the highest bidder; and
on the fourteenth of the same month, all the real estate, includ-
ing the said forty and a half acres of the Hamburgh compa-
ny, were struck off and sold to the said defendant, L'Homme-
dieu, for two hundred and eighty-five dollars.    A few days after
the sale, viz., on the thirty-first of December following, L'Hom-
medieu executed to Pratt, the complainant, a lease of the prem-
ises, purchased for three years, at a yearly rent of three thousand
dollars, and on the next day, being the first of January, eighteen
hundred and thirty-nine, L'Hommedieu entered into an article
of agreement with Pratt to sell him the premises for thirty thou-
sand dollars, payable in installments. During the residue of the
winter and spring, various unsuccessful efforts seem to have
been made by the parties to raise money and put the works in
operation, or to sell the premises; at length, in the succeeding
June, Pratt and L'Hommedieu started to go to New York to
obtain a loan of money or a purchaser for the premises, but at
Newark Pratt was arrested and thrown into prison for debt,
from whence, in due course of law, he was discharged as an in-
solvent debtor, making David Jones and Elias Freeman his
assignees under the statute, and at a subsequent period, he made
to Joseph B. Nones, of the city of New York, a special assign-
ment of his estate and interest; and these three persons, claiming
to be assignees, together with Pratt and the Hamburgh Manu-
facturing Company, constitute the complainants in this cause.
Some time in June, after Pratt was arrested, the defendant,
L'Hommedieu, claiming under the sheriff's deeds, and Edsall,
one of the principal creditors and a mortgagee of the Ham-
burgh company, entered into possession of the premises in ques-
tion, and since then have continued to hold the same and to
use the furnace and ore, in the manufacture of iron, to a very
considerable extent, paying off some of the creditors of the Ham-
burgh company, buying up others at a discount, and leaving
others unarranged, one or two of which have been transferred
to and are now held by Pratt.    In addition to L'Hommedieu

and Edsall, the bill also makes the several creditors interested in the Hamburgh property defendants, all of whom, except L'Hommedieu and Edsall and Daniel Haines, one of the creditors, have suffered a decree *pro confesso* to be taken against them. Mr. Haines has filed a separate answer and the other two defendants a joint one.

The complainants charge in their bill that L'Hommedieu purchased the property as a trustee, in the first place to pay off the encumbrances and the claims of such creditors as came into a certain arrangement entered into prior to the sale, and, lastly, for the company, to whom was reserved a reversion or right of redemption on payment of said encumbrances and claims, and in pursuance thereof they pray an account to be taken of the same, and also of the property purchased, and the rents, issues and profits thereof, and the personal property of the complainants received by the defendants, and that the deed may be declared a trust deed and the trusts be executed, and the complainants be permitted to redeem on payment of the balance due, &c. The defendants, by whom may be understood L'Hommedieu and Edsall, deny the trust any further than for the creditors who came into the arrangement prior to the sale, and insist that none of the complainants have any interest in the premises; whatever they had being, as alleged, cut off by the sheriff's sale and deeds.

The *onus* of proof is on the complainants, and the answer being responsive to the bill, must be overcome by sufficient and satisfactory evidence. The arrangement referred to as made prior to the sale, consists of certain articles of agreement entered into in writing, on the seventh of December, eighteen hundred and thirty-eight, by L'Hommedieu, Edsall and others, being a large number of the creditors of the Hamburgh company, some of whom had liens and some not, by which L'Hommedieu was appointed a trustee, to purchase in at the sheriff's sale the Hamburgh property, and also the Clinton property whereon is the ore bed, and to raise by bond and mortgage a sufficient amount of money to pay off the purchase money, the liens on the property and the creditors who came into the arrangement, and also two thousand dollars to put the furnace in operation, with power also to lease the property " to some suitable competent

person," and also, if he, the lessee, desires it, "to sell to him the premises, upon his securing to the trustee the payment of the whole costs of the premises, including our respective claims, with interest." As neither Pratt nor the Hamburgh company appear on the face of this agreement to be parties thereto, it is insisted by the defendants that this writing will cut off any prior parol negotiations if there were any; but this being a mere arrangement of the creditors themselves to screen their claims, by appointing a trustee to purchase the property and so dispose of it as would answer their object, it was not proper that the defendants in execution, in which light Pratt as well as the company may be considered as standing in this court, should be parties thereto, particularly as the agreement did not embrace all the creditors. If, then, the complainants have any claim on the trustee or trust property, we must look beyond the article of agreement, which could in no way bar the rights of those who could not in the nature of things be a party to it, or be a waiver or merger of any prior agreement made with or by them. It was competent for all or any of the creditors to purchase the property, personally or by an agent or trustee, and take the same exclusively to themselves, without any arrangement with any of the complainants; but the question is, did they do so? or was there any and what arrangement made with Pratt or the company? The debts of the company are estimated at about thirty thousand dollars; but the executions by virtue of which the Hamburgh property was sold, amounted, exclusive of interest and costs, to less than seven thousand dollars; besides these there were several mortgages, the whole encumbrances amounting to about seventeen thousand dollars, leaving debts of from ten to thirteen thousand dollars without lien or security; and these creditors as well indeed as the judgment creditors, felt some fears for the safety of their claims, more probably from the magnitude of the property and the difficulty of finding a purchaser than from a deficiency in its real value. We accordingly find that whilst Pratt was endeavoring to negotiate a loan, the creditors were also endeavoring to arrange matters by securing a loan or otherwise, in case a sale became inevitable, so as to secure their interests respectively. No formal agreement, however, appears to have been entered into by the creditors until on the day of

sale, the seventh of December. On that day, we learn from the evidence, that not only the creditors were present, but Pratt was there also with Aaron B. Nones as a friend to purchase the property, and David Ryerson and others, who felt an interest in the property, and of those concerned therein. Although the property had been advertised for sale for a long time by the sheriff, and repeatedly adjourned, yet it seems Pratt had been unable to obtain a loan of money to prevent the sale; yet it is not probable that he would have permitted the property to have been entirely sold from him if he could prevent it, for although the extravagant value he appears to have set on the property, as well as on the Erie lots given in exchange therefor, may excite a smile, yet it abundantly appears from the whole case that he considered it of sufficient importance to him to make every exertion and arrangement in his power to prevent his interest in the company from being entirely swept away by an absolute sale. He states in his bill that he attended the sale with Nones, as the agent of a friend, prepared to purchase the property if it should become necessary. This allegation does not seem to be clearly denied by the answer. All the witnesses agree that Nones was at the sale, and many of them understood him as there in the character of a purchaser. He says himself, in his evidence, that he went there for his brother, John B. Nones, to purchase the property if it should become necessary, and that, for that purpose, he took with him about eleven or twelve thousand dollars, and had authority to draw for as much more as might be necessary—the whole amount of executions on which the sale of the Hamburgh property and of the Clinton Mine tract together amounting to less than eleven thousand dollars. It also appears from the evidence of Joseph M. Brown that Nones took money with him. As none of this evidence or the complainants' allegation in the bill is answered or disproved, we must take the fact as satisfactorily established, that Nones was at the sale to purchase the property for the benefit of Pratt, and prepared with the means in hand to do it, and that Pratt knew of it, for he went with him from New York. Now it does not appear that there were at the sale any others prepared for the extremity as well as Pratt and Nones were; they, therefore, must have had the advantage of the creditors, who seem to have been

well aware of that fact, for if the sale had gone on, from all that appears in the testimony, Pratt's friend might have purchased the property for little over the amount of the encumbrances and have shut out all the claims which were not liens on the premises; hence the anxiety of the creditors that some arrangement be made, and the various efforts from time to time to make combinations or secure loans to effect their object; hence the anxiety of Mr. Ryerson and others to secure a loan to protect their friends and the small creditors. If Pratt occupied this advantageous position, it is not probable that he would have relinquished it without some equivalent; but he did relinquish it, and suffer the Hamburgh property to be sold for two hundred and eighty-five dollars in the aggregate, by small parcels, and for small sums. Nones was in favor of the arrangement, and made no bid; Pettis was also stopped from bidding by the same consideration. How is this? Neither Pratt or the company have any part or lot expressly in the written agreement of the creditors, yet Pratt was there and consulted about the arrangement, and was informed of the course of proceeding, at the instance of Mr. Haines, lest he might frustrate the matter. At one time he comes out from the room where the creditors were in consultation, with a written paper in his hand, which he said were propositions to him; the witness proves a copy, which looks very much like the allegations in the bill, but as the original was not accounted for in proof, it is unnecessary to remark on the contents of the copy. The creditors' agreement authorizes a lease, and although Pratt is not named, a majority agree that he was to be the lessee and also the purchaser for the costs and interest; and of the money which the trustee was authorized to loan, two thousand dollars was to be appropriated to put the furnace in blast, and this before the creditors without liens were to be paid. All this goes to show that the parties did not consider the sale as absolute, or to be of very long duration, but rather of some temporary arrangement to secure the creditors, until by a sale or loan the matter could be placed on a permanent footing. A few days after the sale the trustee, L'Hommedieu, executes the lease and agreement to sell to Pratt; now if this was not done in pursuance of a prior agreement, why was it done? The creditors had no great confidence in Pratt, they had indeed but little reason to have,

why should there have been a loan to him for three years, without security, and a bill of sale for the property, for thirty thousand dollars, and an appropriation of two thousand, to carry on the furnace? These facts and circumstances lead, irresistibly, to the conclusion that the sale was not considered, by the parties, as absolute and beyond redemption, but that Pratt, either for himself or the company, has a reversionary right, and does not stand as a mere ordinary purchaser, who has been unable to comply with his agreement; and this conclusion is supported, I think, by the weight of the parol evidence, taken in connection with the circumstances. David Ryerson says there seemed to be a perfect understanding between Pratt and the creditors; he was consulted—was to have the management; that L'Hommedieu purchased it for the benefit of the creditors, "and was to hold it in trust for them *until the debts and claims of the company were settled.*" There certainly is some discrepancy in the testimony—several witnesses testify against any such understanding; but, without recurring to the testimony of each witness, I cannot but conclude that the decided weight of testimony is in support of the bill. All agree that L'Hommedieu purchased as a trustee, and not an absolute estate. The written agreement makes no provision for a surplus; in case there should be one, to whom does it go? Not to the creditors, for then they would be paid off; not to the trustee, for he cannot speculate on his trust. It must be by clear implication, if not otherwise, for the complainants. But the circumstances go to sustain the bill and show there must have been an agreement. Whilst the lease has nearly three years to run, and, before the first payment on the article of sale becomes due, the defendants, L'Hommedieu, as trustee, and Edsall, as creditor and mortgagee, take possession of the premises and carry on the works to the present time. Walker does not seem to have had authority for delivering up the premises, and the mere verbal statement of Pratt, whilst in prison, with all the papers remaining open and executed, can hardly be taken as a relinquishment. I think, after a review of all the facts, that that part of the Chancellor's decree directing an account to be taken of the Hamburgh property, should be affirmed.

Another **question in the case** remains to be disposed of, arising

on that part of the decree which determines that the complainants are not entitled to relief as to the Clinton mine tract, because the sale was fraudulent. I have been unable to come to the same conclusion, either as to the decree or the reasons therefor. This tract of land belonging to the Clinton company was regularly advertised and sold by the sheriff of Sussex, by virtue of two executions in his hands, and L'Hommedieu being the highest bidder, it was struck off to him accordingly. It is true, Mr. Edsall had a mortgage on the premises, younger than the executions, and was at the sale to protect his rights, by purchase or otherwise, and I can see no fraud or impropriety in the Hamburgh creditors agreeing that their trustee should purchase the tract upon the best terms that it could be obtained, and, if necessary for that purpose, to agree to pay·off Edsall's mortgage, though younger than the executions by virtue of which the sale took place. This was doing no injury to the Clinton company or their creditors. The sale, then, being a *bona fide* sale to the highest bidder, is neither fraudulent or void, but is good and valid against the Clinton company and its creditors. Nor is there anything in the agreement between Pratt and the Hamburgh creditors, or between them and the defendants, or either of them, that can be considered fraudulent. If L'Hommedieu had not purchased it, of course Edsall would have done so to secure his mortgage, and, in either case, the general creditors of the Clinton company would have been shut out from any claim on the property; and, if all the interest of the Clinton company and their creditors was disposed of at the sheriff's sale, they had no right to be made parties to the present suit, and, of course, the bill cannot be dismissed, either for that cause or the alleged fraud. The next inquiry is, if the sale was good and valid, in what character, and for what purpose did L'Hommedieu purchase? Why, clearly, as trustee and for the benefit of the trust generally. The very first clause of the article of agreement of December 7th, 1838, amongst the Hamburgh creditors, states, "And whereas, for the purpose of endeavoring to secure ourselves, we deem it advisable to purchase the said real estate— *i. e.*, the Hamburgh property—*and also certain real estate of the Clinton Manufacturing Company, situate, &c.,* whereon is an ore bed, advertised by the said sheriff, therefore, &c., we

do hereby constitute Elias L'Hommedieu our agent and trustee, in his own name, and for his own behalf and use, *to purchase the said properties,*" &c. Either, then, we must agree with the Chancellor and declare the sale fraudulent and void, or if good, we must decree that the purchase was by the defendant in trust for others. The disagreement to the first position necessarily affirms the second. If L'Hommedieu then purchased and held the Clinton property as a trustee, for whom was the trust? There can be little doubt in concluding that it was for the same persons for whom he purchased in and held the Hamburgh property; and if we concur with the Chancellor in saying that that was subject to a general trust for the complainants, so we must say in regard to the mine tract, otherwise we come to this strange conclusion, that the complainants are entitled to the redemption of the Hamburgh property after paying the debts due to the creditors, together with the expenses, &c.; but as to the Clinton mine tract, although purchased and held as a trust, yet neither the complainants or the creditors who appointed L'Hommedieu agent and trustee, can have any interest in or benefit from it; the creditors cannot, because they will be all paid off by the redemption, and of course they cannot be permitted to speculate on the trust property when there is a general trust or right of redemption behind them; and the complainants cannot by our decree; so that between the two, the defendants would hold the property absolutely free and clear of either trust; a conclusion, I apprehend, which no one would be willing to adopt. And although this is a mere bill for the redemption of the Hamburgh property, I see no difficulty in sustaining and carrying out in the present suit the trust in regard to the Clinton mine tract. The Hamburgh property is large and valuable, but its value very much depends on the ore to be obtained from the Clinton tract. The whole was about to be sold at sheriff's sale; certain creditors and the complainants agree that the sale shall go on, and that the defendant, L'Hommedieu, shall purchase it for their benefit, not only the iron works and property attached to them, but also the mine tract. The purchase is made accordingly, and when the defendants refuse to execute the trust with the complainants, we deem that the trust is valid, and that defendants shall give effect to the whole trust—that is,

although the complainants have no right of redemption in the mine tract, yet, before they pay anything to redeem the property, they have a right to a strict account of all the trust property, and the rents, issues, and profits thereof, and a sale of the mine tract, and that the balance arising therefrom, after paying all the claims on the tract itself, including Edsall's mortgage—for that was to be paid by the agreement—should go to liquidate the claims against the Hamburgh company, embraced in the trust, and thus lessen the amount to be paid by complainants for the redemption. This conclusion results, necessarily, from the transaction, the whole property being *bona fide* sold, and bought by the defendant, in trust, to pay off certain creditors and claims, and, ultimately, after these claims were discharged, to be held for the benefit of the complainants. If they come forward and pay off all those claims, they have a right to the property, and, whether mine tract or Hamburgh estate, the court must consider them held in trust for their benefit. It must be so, unless we conclude the sale was fraudulent and void. I think that this part of the decree should be reversed, and neither party allowed costs in this court.

WHITEHEAD and CARPENTER, Justices, and PORTER, SCHENCK, and SPENCER, Judges, concurred in this opinion.

NEVIUS, Justice, voted for affirming the whole decree.

Decree affirmed, as to the Hamburgh property, and reversed as to the Clinton mine farm, this, also, as well as the Hamburgh property, being decreed to be held by it in trust for the Hamburgh company and its creditors.